MONIQUE C. WINKLER (Cal. Bar No. 213031)
 winklerm@sec.gov
JASON H. LEE (Cal. Bar No. 253140)
 leejh@sec.gov
DAVID ZHOU (NY Bar No. 4926523)
 zhoud@sec.gov
JOHN HAN (Cal. Bar No. 208086)
 hanjo@sec.gov
SILVANA A. QUINTANILLA (Cal. Bar No. 284964)
 quintanillas@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| vs. | COMPLAINT |
| NDB, INC. and NIMA GOLSHARIFI, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY OF THE ACTION**

1. From at least August 2020 through August 2021, Defendants NDB, Inc. ("NDB" or "the Company"), a private technology startup company formerly based in San Francisco and Pleasanton, California, and its Chief Executive Officer Nima Golsharifi ("Golsharifi") engaged in the fraudulent offer and sale of securities. Golsharifi claimed that NDB's purpose was to develop and manufacture a self-charging nuclear-based battery that would be enclosed in a diamond-like carbon structure (the "NDB battery"). Defendants raised over $1.2 million from approximately 70

COMPLAINT
*SEC v. NDB, INC. ET AL.*

investors located in the United States and abroad after making material misrepresentations about the state of NDB's technology and its customer base.

2.   On August 25, 2020, NDB issued a press release (the "Press Release") approved by Golsharifi that contained a number of materially false and misleading statements, including but not limited to the following. The Press Release touted a purported "Major Technological Laboratory Breakthrough" for the NDB battery and the signing of the Company's "First Beta Customers."  In particular, NDB falsely claimed that (1) it had successfully completed "Proofs of Concept tests" of the NDB battery at a national laboratory in the United States (the "American Lab") and a laboratory affiliated with a major university in the United Kingdom (the "British Lab"), and that its "proprietary battery" achieved a "breakthrough" 40 percent charge in both tests, and (2) NDB had signed "two beta customers."  In reality, NDB had not conducted any testing at those laboratories or developed its own battery for such testing, and had not signed any beta customers.

3.   The Press Release garnered significant media and investor interest.  Within the first month of the Press Release, NDB raised approximately $660,000 from U.S. and foreign investors who purchased shares of NDB.  Over the next 11 months, NDB raised about $580,000 in additional investor funds without issuing more press releases or making any major announcements.

4.   As a result of the conduct alleged in this complaint, Defendants violated Section 10(b) and of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].

5.   In this action, the Commission seeks permanent injunctions; disgorgement of ill-gotten gains with prejudgment interest; and civil monetary penalties.  The Commission also seeks an order prohibiting Defendants from participating in the issuance, purchase, offer, or sale of any securities, and imposing an officer and director bar against Golsharifi.

**JURISDICTION AND VENUE**

6. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8. Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

9. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. For example, NDB's principal place of business was in this District in 2020 and 2021; at least seven investors are from California, including three from the Northern District of California; and Golsharifi opened bank accounts for NDB in California and directed investors to wire funds into those accounts.

10. Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in San Francisco County and Alameda County, where NDB's principal place of business was located during the relevant time period.

**DEFENDANTS**

11. **NDB, Inc.** is a company currently incorporated in Wyoming with its principal place of business listed as Sheridan, Wyoming. From February 2019 to November 2022, NDB was a California corporation with a listed principal place of business first in Pleasanton, and then in San Francisco. NDB was incorporated as a Wyoming corporation in September 2022.

12. **Nima Golsharifi**, age 36, resides in London, United Kingdom. Golsharifi is the co-founder, CEO, and majority owner of NDB. Golsharifi has controlled NDB's business and

research functions and operations from the Company's formation in 2019 through the present. At all times relevant to the complaint, Golsharifi was acting in his official capacity or acting in furtherance of the business. Accordingly, the actions, omissions, and state of mind of Golsharifi are imputed to NDB.

**FACTUAL ALLEGATIONS**

**A.     Defendants Made Materially False and Misleading Statements in the Press Release**

13.    Golsharifi co-founded NDB in February 2019 as a "Silicon Valley" company to develop and manufacture a self-charging nuclear-based battery. At the time, Golsharifi did not live or work in the United States, and instead resided in the United Kingdom. During all times relevant to this complaint, Golsharifi controlled all important aspects of NDB's operations, research efforts, and self-promotion campaigns.

14.    In April 2020, Golsharifi hired a San Francisco-based boutique communications firm (the "Communications Firm") to help NDB with a public relations campaign for the Company, which included a press release to be issued in the summer of 2020.

15.    On August 25, 2020, with the assistance of the Communications Firm, NDB issued the Press Release titled "NDB, Inc. Announces Major Technological Laboratory Breakthrough for the First Universal, Self-Charging Nano Diamond Battery; First Beta Customers." The Communications Firm relied on Golsharifi and NDB for the information included in the Press Release, and Golsharifi, who at all relevant times had ultimate authority to make decisions for and act on behalf of the Company, approved the final draft of the Press Release.

*1.    Defendants' False Claims of Conducting Tests at Two Preeminent Laboratories*

16.    The Press Release contained multiple false and misleading statements about NDB's proof of concept testing and its signing of beta customers. First, NDB claimed that it had completed two successful proof of concept tests of "the NDB battery" at the American Lab and the British Lab, and that in both tests, its "proprietary battery" had "achieved a breakthrough 40% charge, a significant improvement over commercial diamonds." Proof of concept testing is commonly understood to mean that testing has been performed to confirm that a company's idea

for a product is workable in the real world, which is the precursor to the creation of an actual working prototype.

17. Contrary to the claims in the Press Release, NDB had not conducted any proof of concept tests of the NDB battery or achieved any significant results at the American Lab. In fact, beyond a few sporadic emails between Golsharifi and a scientist at the American Lab (the "Scientist") between January 2017 and August 2019, NDB did not even have contact with the American Lab, much less conduct any testing. The Scientist did not perform any proof of concept tests with NDB or Golsharifi. As Golsharifi has since admitted, NDB did not develop its own battery, and did not test its technology at the American Lab.

18. Similarly, NDB also did not conduct any proof of concept testing of the NDB battery or achieve any significant results at the British Lab. In September 2020, a few weeks after the Press Release was published, the head of the British Lab emailed the Communications Firm to request that NDB remove the reference to the British Lab from the release as "[n]o such testing ever took place at the [British Lab], as far as my staff are aware." Earlier, the American Lab's press office had similarly reached out to Golsharifi with questions about the American Lab's appearance in the Press Release, and, in response, Golsharifi directed the Communications Firm to avoid using the two laboratories' names in future articles.

19. Golsharifi blamed intellectual property concerns instead of telling the Communications Firm that NDB had not conducted tests at either laboratory. Consequently, Golsharifi did not undertake or direct any effort to issue any retraction or correction of the Press Release, nor did Golsharifi or NDB undertake any effort to correct any published articles that reported on the Press Release's false statements concerning successful proof of concept tests at the two laboratories.

20. Golsharifi knew or was reckless in not knowing that the statements in the Press Release regarding the proof of concept testing and the test results were false and misleading. By virtue of Golsharifi's involvement in, and control over, the Company, NDB also knew or was reckless in not knowing that the statements regarding the proof of concept testing and the test results were false and misleading.

### 2. Defendants' False Claims that NDB Signed Two Major Beta Customers

21. Second, the Press Release falsely announced that NDB's first two beta customers were "a leading global aerospace, defense and security manufacturing company" and "a leader in nuclear fuel cycle products and services," respectively. In reality, NDB did not have any beta customers at the time of the Press Release. The term "beta customers" is commonly understood to refer to customers or potential customers who use, test, and provide feedback on a product that the seller is developing.

22. The aerospace and defense company referenced in the Press Release was a prominent U.S. company (the "U.S. Defense Company"), as Golsharifi has since admitted. NDB approached the U.S. Defense Company in early 2020 about a potential collaboration. However, no partnership or collaboration ever materialized. NDB signed a non-disclosure agreement and also sent the U.S. Defense Company a draft letter of support in which the U.S. Defense Company would agree to work with NDB.

23. However, the non-disclosure agreement expressly stated that it did not create a business relationship of any kind, and the draft letter of support was never executed by the parties. Moreover, prior to the publication of the Press Release, NDB did not enter into any agreement with the U.S. Defense Company to test any NDB products or prototypes, including the NDB battery, and the U.S. Defense Company did not conduct any testing of NDB products.

24. The second beta customer listed in the Press Release, which specialized in nuclear fuel-related products, was a major French company (the "French Nuclear Company"), as Golsharifi has since conceded. In March 2020, NDB was selected as a grand finalist of an international startup contest hosted by the French Nuclear Company, which gave NDB the possibility of having its technology tested by the French Nuclear Company.

25. However, being a grand finalist did not guarantee NDB a contractual relationship with the French Nuclear Company. NDB and the French Nuclear Company exchanged emails in the months leading up to the Press Release, but never formalized any relationship. Prior to the issuance of the Press Release, NDB did not have any agreement with the French Nuclear Company

to test any NDB products or prototypes, including the NDB battery, and the French Nuclear Company did not conduct any testing of NDB products.

26. Golsharifi knew or was reckless in not knowing that the statements in the Press Release regarding the beta customers were false and misleading. By virtue of Golsharifi's involvement in, and control over, the Company, NDB also knew or was reckless in not knowing that the statements in the Press Release regarding the beta customers were false and misleading.

27. Defendants' misrepresentations in the Press Release regarding purported successful proof of concept testing at the American Lab and British Lab, as well as NDB's purported signing of its first two beta customers, were material to the investors who purchased shares of NDB after the publication of the Press Release.

### B. Defendants Amplified the Media Attention Resulting from Their False and Misleading Press Release

28. NDB received significant attention from the news media, online blogs, and potential investors as a result of the Press Release. Within a day of the Press Release's publication, approximately sixty-three articles had been published based on information in the Press Release, including articles on well-known technology news websites. NDB took advantage of, and amplified, this press attention by posting links to the articles on its social media accounts. For example, after one prominent technology news website published an article titled "NDB aces key tests and lands first beta customers," NDB promoted the article on both its Twitter account and website, ndb.technology.

29. After NDB issued its Press Release, hundreds of potential investors contacted NDB through its website and by emailing the Communications Firm to express interest in investing in NDB. NDB staff members followed up with potential investors and requested certain information from them, including their intended investment amount and a self-certification of investor sophistication or accreditation. NDB provided potential investors who were accredited or self-certified as sophisticated with the opportunity to buy shares of NDB at $4.35 per share and directed interested investors to wire money to two NDB business bank accounts in the United States controlled by Golsharifi.

30. In the month following the issuance of the Press Release, about twenty-seven investors invested approximately $660,000 in NDB. Eventually, in the year after the Press Release, Defendants received approximately $1,240,000 in investment funds from around sixty-eight investors in the United States and abroad.

31. Because NDB did not have a commercial product and thus did not have any sales or revenues, Golsharifi paid himself a biweekly salary using investor funds.

32. To date, NDB has never issued a correction or retraction of the false and misleading statements it made in the Press Release.

33. Furthermore, to date, NDB has not developed a prototype of its NDB battery.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

34. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 33.

35. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

   a. Employed devices, schemes, or artifices to defraud;
   b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and
   c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

36. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

*Violations of Section 17(a) of the Securities Act*

37. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 33.

38. Defendants, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a. with scienter, employed devices, schemes, or artifices to defraud;

    b. obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

39. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Permanently enjoin Defendants from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**II.**

Permanently enjoin Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any securities, provided however, that such injunction shall not prevent Defendant Golsharifi from purchasing or selling securities for his own personal accounts.

**III.**

Enter an order prohibiting Defendant Golsharifi from serving as an officer or director of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**IV.**

Issue an order requiring Defendants to disgorge all ill-gotten gains received as a result of their unlawful conduct plus prejudgment interest thereon pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

**V.**

Issue an order requiring Defendants to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just, equitable, and necessary.

Dated:  September 14, 2023                           Respectfully submitted,

                                                      /s/ Silvana A. Quintanilla
                                                     Silvana A. Quintanilla
                                                     Attorney for Plaintiff
                                                     SECURITIES AND EXCHANGE COMMISSION